We'll proceed to the second case of the day, number 18-3322, Local 702, against the National Labor Relations Board. And we'll hear first from Mr. Grant for the union. Mr. Grant, may it please the court. My name is Chris Grant. I represent the petitioner, Local 702. So the central issue in this case is whether Pat Hudson's strike-related conduct, taken in context, reasonably tended to intimidate or coerce any non-strikers. And in answering this question, the board must consider, consistent with precedent, all of the relevant circumstances. Before you go into the factual part of this, in looking at the standard, it's whether or not her conduct reasonably tended to intimidate or coerce non-strikers into what? Or is it just reasonably it would tend to intimidate or coerce non-strikers, period? In other words, does it have to be linked to the non-striking activity? It is reasonably tended to intimidate or coerce any non-strikers in the exercise of Section 7 rights under the National Labor Relations Act, protected concerted activity, which admittedly non-strikers have the right to refrain from striking. So originally, the company accused Ms. Hudson of three incidents of misconduct. And the ALJ, the administrative law judge, the board, and the DC circuit found that Ms. Hudson engaged in no misconduct at all in two of those incidents. And the record evidence for those incidents refuted claims by the company that she was intentionally harassing non-strikers. Mr. Grant, can I just, before you go on, we're not seeing a lot of NLRB unfair labor action, practice actions these days, as compared to prior decades. So why are we here instead of in, why aren't you in the DC circuit, given its prior consideration of this? Well, we were prior, prior case was in the DC circuit. To be honest, so the statute allows us, allows the aggrieved party. The employer chose the DC circuit the first time around. We could go to the DC circuit, that's where we went the first time up. The union and the employer are both located in the Seventh Circuit in Mattoon, Illinois. To be honest, it's, Mattoon, to be honest, it's much easier and more convenient for the union to come up to Chicago than it is to go to the District of Columbia. Ms. Hudson wanted to be here, it's more easier, easier for her to be here. So we chose to appeal up here this time. So did you choose the DC circuit the first time, or was that the employer? I'm sorry, what? Who chose the DC circuit the first time? The company. So, okay. You're on. Was it agreed to, or? No, so the first time, when the labor board ruled for Ms. Hudson, to put it quickly, on all three incidents, the company appealed up to the DC circuit, which they're allowed to do, any appeal of an agency decision of the NLRB can go to the DC circuit or to the circuit where the URP occurred. So the record evidence refuted the claims in two of these incidents, definitively, that Ms. Hudson was harassing non-strikers. And then on the third incident, what I'll call the Troy Connery incident, the ALJ and in no misconduct that was serious enough to warrant her losing the protection of the National Labor Relations Act. But on appeal, the DC circuit ruled that the board had misapplied the relevant legal standard by stressing one factor over others. And then we're here today because, on remand, the board, with different composition, three new members on remand, in a two-to-one decision, a majority of the board misapplied that legal standard again. And this time, by placing undue stress on the inherent dangers of highway driving. So the union submits the court should vacate that board's decision and find that the company violated the act in terminating Ms. Hudson. So first, the board failed to consider all of the circumstances in this case. And at the critical moment, and after years of litigation, we're down to pretty much one moment here. The board finds that Ms. Hudson, who was driving on a state highway outside Mattoon, moved into the fast lane of the highway, preventing Mr. Conley from passing her. And the evidence shows that Ms. Hudson was driving around the speed limit, and that there was, in her lane, at least a car's length, if not more, between her and Mr. Conley. The ALJ... One whole car's length? I'm sorry? One whole car's length? Yeah, at least a car's length, yes. That's unbelievably dangerous, to just be one car length apart. Well, Your Honor, Mr. Conley and Mr. Diggs both testified that they were not close to having an accident. That Mr. Diggs stated specifically that there was no danger of Mr. Conley hitting Ms. Hudson. The ALJ further made a credibility determination that Ms. Hudson did not cut off Mr. Conley when she moved over. And there are dangers to highway driving, no doubt about that. Millions of people get in their cars every day and drive, nonetheless. And where the board... The mistake here is overemphasizing that inherent danger of highway driving over the evidence, in the record, that she did not cut off Mr. Conley, that she was not close to... She did not cut him off because she was at least, or was, one car length ahead of him? That's the theory? The judge said that when she switched over, she did not cut him off, which is a term that I think is understood as some did not move with the intent to endanger him, to intimidate him. Now, interestingly... How do you draw that inference? I'm sorry? How do you draw the inference without intent to intimidate? Well, that she... That cut off would mean that she moved with the idea of intimidating him. I think what the judge said is... That sounds like your interpretation. Yes. So the judge says, the ALJ's creditor says she did not cut off. The judge says at some point, Ms. Hudson's in front of Ms. Conley, that she moved over to that lane. I think it's not that uncommon for cars and trucks to move in front of each other, even at one car length or more. Did the ALJ also find that Mr. Conley did not have to put on his brakes or slam his brakes when she moved in front of him? That's correct. Well, that's correct. The first time that he attempted to pass, he took his foot off the accelerator. That's what he found. The second time, I believe the ALJ said, it's in the record, I'm not 100% sure, that he might have tapped the brakes. And actually, I think actually what he found is that he might have had to slow down and that what he did is tap the brakes to get back behind Ms. Weaver, who was also a striker and who was in front of Mr. Conley at that time. So in reality, and Mr. Diggs here, in his testimony, said that in reality, that it was not a danger of Mr. Conley hitting Mr. Hudson and that he moved back behind Ms. Weaver. There were other, back to your point about the cutoff. What's interesting here is that this is the one important point where the board departs dramatically from the finding of the ALJ. The board in its decision, the supplemental decision on remand, specifically uses the word cutoff, that Ms. Hudson cut off Mr. Conley with an intent or calculated attempt to intimidate him. The ALJ made a specific credibility resolution that that's not the case. And the board on a supplemental decision makes no effort to explain or justify how it made that opposite conclusion of the ALJ. Now that credibility determination of the ALJ is due significantly. He observed the witnesses. He lived the case. And was the credibility determination that she didn't cut him off or that there was an intent? Did not cut him off. That was what the, in the ALJ decision, did not cut him off. Further, this court has held that when a, the board makes a factual determination, an intent is a factual determination. And when the board makes a factual determination that departs from a finding of the ALJ, that it is due less deference. That it stands on much, much weaker ground. And is not due the deference that a, the court of appeals normally gives under the substantial evidence standard. The board also here sort of glossed over the fact that Ms. Hudson was driving at all times around the speed line. In fact, it was Mr. Conley who was speeding at one point during this episode. He was, the highway here was about 55 miles per hour, although it drops at a point to 45 or 50 near a hospital. Mr. Conley around this time was going 69 miles per hour at some point in this episode. And the board glosses over the fact that Hudson, Ms. Hudson was driving the speed line. And the board focuses on saying that, well, she impeded his progress or obstructed him. And if you're driving the speed limit as Ms. Hudson was in front of another car, you're not obstructing any progress. You, Mr. Conley might not have wanted to drive as fast as he wanted. Have you been on I-65 in Indiana lately? Well, I have, I, I, I, people do speed, unfortunately. But I don't think the fact that you cannot drive as fast as you want to drive means you're intimidated. Or that you're slow, it's frustrating, might be annoying. It happens to me all the time where you're stuck behind another car, you want to go faster. But it's not an act of intimidation. And the board, I think, the problem here is that they go, they jump from this, the facts here which don't show intimidation to filling that gap with the inherent dangers of highway driving. And again, no doubt that driving can be dangerous. But that's something that everyone assumes every day when they get into their car. At highway speeds, one car length apart with intentional maneuvering. Well, intentional maneuvering. Aimed at you as the driver. Intentional maneuvering in the sense that she moved over into that lane. And she knew who was in that vehicle. Yes, she did. Yes, sir. The other thing that the board does not consider is why Ms. Hudson was in front of Mr. Connelly. Which is, there's no mention of that in the decision. Was that it's undisputed that Ms. Hudson and Ms. Weaver did not have a plan to get in front of Mr. Connelly. This was happenstance that they, they ran into him or saw him on the highway. Or driving through town and they followed him. There was no predetermined plan to go after anyone or follow anybody. And so, Ms. Weaver and Ms. Hudson didn't have a way to communicate with each other. There was, they didn't know, Ms. Hudson didn't know what Ms. Weaver was doing when she moved in front of Mr. Connelly. So. Were they both fired? I'm sorry. Were they both fired? Ms. Weaver also? Yes, they were both fired. And Ms. Weaver's case was, was settled, you're right. But they, so they did not know what they were doing. And the board makes no mention of the fact, the intent inference that they make is refuted by the fact that they didn't have a plan. Do you want to save any time for rebuttal? I'm sorry, your honor. Do you want to save any time for rebuttal? Yes, I do. Thank you. All right. Thank you, Mr. Grant. For the board, Ms. Johnston. Good morning, and may it please the court. My name is Rebecca Johnston. I represent the National Labor Relations Board. The DC Circuit, in remanding a piece of this case to the board, gave the board clear instructions. It had to consider, consistent with its precedent, all of the relevant circumstances, and evaluate the objective impact on a reasonable non-striker of misconduct committed on a high-speed public roadway with third-party vehicles present. The board took seriously this remand instruction, considered all the circumstances and accredited facts found by the administrative law judge, and found that Ms. Hudson's conduct was sufficiently serious to cost her the protection of the act. Should Ms. Hudson's 39-year tenure with the company, with a very clean record, have any impact on the analysis? No, Your Honor. At this stage in the analysis, we're only determining whether she lost the protection of the act by her serious misconduct. If she indeed lost the protection of the act, the employer can impose any sort of discipline, regardless of her. But in determining the reasonableness of the actions, and whether or not her actions would have intimidated, does her length of tenure with the company have any impact, and her clean record? The board didn't consider this. I know the board didn't. I'm asking you if it's something that should have been considered, given that you're supposed to look at the totality. The board made conclusions about an employee's intent with respect to another employee. Should it have considered, when assessing intent, the fact that she had been a 39-year employee with the company, and had a clean record? I don't think there were any blemishes on it at all. No, Your Honor. And I don't believe that the union is making the argument that the board should have considered this particular circumstance. In any event, there's ample evidence of intent, notwithstanding her clean record. The union sort of glosses over different parts of the facts. We have to go back a little bit farther in time. This is a labor dispute. Two strikers are targeting a non-striker. They're traveling at 55 miles per hour. They pass the non-striker. They slow down to approximately the speed limit, which was, there's record evidence that most cars on this road travel faster than the speed limit. Cars piled up behind Ms. Hudson, and she pulled over to let a line of neutral cars pass who weren't involved in the strike. But when Mr. Conley tried to follow suit, she pulled back over into his lane. There's undisputed record evidence that he braked and exited the highway at the first chance he could to avoid the situation. The board used its clear pine moldings test to examine whether, from his perspective, a reasonable non-striker would be coerced or intimidated in this conduct, given the high speed that they were traveling, given the fact that her moving in and out of the passing lane injected an element of unpredictability, he didn't know what would happen next, whether she would escalate or whether she would just simply drive in that direction. So he turned off the highway and the board- How do you distinguish between the conduct intimidating and coercing Mr. Conley in the exercise of the protected activity and not striking here, versus just annoying him on the highway and not enabling him to pass her? Well, that was the inference the board drew, that it went beyond just annoying him. And his Section 7 right in this circumstance was the right to refrain from striking, and he was trying to get to his work site, and- But what evidence is there that would support an inference that the conduct was aimed at intimidating the protected activity, as opposed to just annoying somebody on the highway? I think that's just a matter of degree, and the board found that she crossed that line. But in order to have substantial evidence, which is the test we look at here, whether or not there's substantial evidence to support the board's determination, I'm asking you, what is the evidence to support that, as you call it, just a degree, that this was geared toward the protected activity? I think the fact that she, the two strikers targeted the non-striker. They followed him away from the premises. They slowed down in front of him, effectively blocking him from passing. The fact that she pulled over and let people who weren't involved with a strike go past. Only when he tried to pass, to come back over into his lane and prevent him from passing and getting to his work site. Ultimately, he had to turn off the highway, and it took a longer time for him to get to the work site. So, based on those facts, the board drew the inference that this wasn't just an annoyance to him or to a reasonable non-striker. It was, in fact, would, in fact, tend to coerce or intimidate someone driving on the highway. Did the ALJ find that taking the exit made his trip longer? I don't remember seeing that on record. I don't believe the ALJ made that explicit finding, no. But there's evidence in the record that it did, in fact, lengthen his commute to the job site. The board doesn't make clear here to what extent it's adopting the ALJ's factual findings. Did it adopt them in whole, or how do we determine what factual findings the board relied on? Yes, Your Honor. If you look closely at the administrative law judge's factual findings and credibility determinations, the board, in its supplemental decision in order, did not overturn any of those credibility findings. It simply drew different inferences from the record. And the union, in its opening brief, concedes that the board largely adopted the administrative law judge's findings. It now is claiming that the board overturned a credibility finding. I believe it made that argument first in its reply brief, and is now making that argument here. I'm not sure if it's saying they overturned it, or they just ignored it. The matter of cutting off Mr. Conley. The board did say that Mr. Conley effectively, or excuse me, Ms. Hudson effectively cut off Mr. Conley from passing. But that's a little bit different than crediting Ms. Hudson that she did not cut him off. And by that, I think the administrative law judge credited her testimony that she did not swerve over in front of him and get extremely close to him. The board's decision here is also consistent with its precedent. The D.C. Circuit asked the board to look at precedent and see where this falls within its precedent. And the board looked at cases where strikers followed non-strikers at a reasonable distance, or passed them and just continued along their way, versus cases that were more extreme, and found that this lied somewhere in between those two cases, those two examples. And the board looks at precedent in this decision at page 58, note 8, and distinguishes that precedent. The board found the Fourth Circuit's decision in Oneida knitting to be particularly instructive. And in that case, two strikers were driving in front of a non-striker, effectively blocking her from passing. The Fourth Circuit found that this was inherently dangerous to obstruct a public roadway, and that the conduct of those strikers was calculated to intimidate. The board here found, under these facts, a similar result should hold. I'd just like to briefly touch on the per se rule argument. The union did not preserve this argument for review. Under Section 10E of the Act, it would have needed to file a motion for reconsideration before the board. In order to give the board the first instance to have a crack at this argument, and give something for this court to look at, the union failed to do so. And so the court is without jurisdiction to consider this per se rule argument. But in any event, the board did not create a per se rule. And you can see that by, in the union's briefing, it doesn't consistently state the per se rule. At times, it says that the board made a rule that highway driving is unprotected. And at other times, it ties the per se rule so specifically to the facts of this case that any sort of factual determination would be a per se rule under that definition. So, just to sum up, Ms. Hudson's serious misconduct cost her the protection of the Act. The company did not violate the Act in discharging her for that misconduct. And we ask that the union's petition be denied. All right, thank you, Ms. Johnston. For the intervening employer, Mr. Dunbacher. Thank you. My time is limited. I appreciate the court allowing me to speak, so I will be brief. The first point I'd like to make is when evaluating the intimidating or coercive nature of the conduct, the inquiry is on how a reasonable employee, who is the targeted employee, will view that conduct. So, the fact that Ms. Hudson was a 39-year employee, the fact that she may have, as Mr. Grant stated, decided to do this on the spur of the moment, is irrelevant. What matters is how a reasonable employee such as Mr. Conley and Mr. Diggs will view the incident. And in fact, the evidence shows that Mr. Conley was harassed. He felt like he was blocked. He tried to pass. He stayed in the lane. He moved back to the right. He ultimately did turn off the highway. There is evidence in the record that Mr. Conley, both based on his testimony, Mr. Diggs' testimony, and an exhibit responded, introduced that he was, he ultimately did choose to turn off the state highway and go in a circuitous route. He was on the major road, the 55-mile-per-hour highway. It's ultimately, it took him a long time to get there. He actually made an incorrect turn, turning off the highway, and ultimately had to take a back road. How do we distinguish that conduct and his feelings as to whether or not he was coerced or intimidated in connection with the protected activity, as opposed to just annoyed and feeling harassed because he couldn't pass her? Well, I think the board has historically looked at this issue in terms of whether or not the employee, whether, how a reasonable employee would react in terms of whether that, there are many rights under the act, one includes your ability to proceed to work. So the board, in many cases, has found that simply blocking an employer's entrance, whether there's any violence or threat of violence or danger, is prohibited, prescribed by the act. So you're saying it doesn't have to be tied to the protected activity, or that the protected activity is something broader than the non-striking employee continuing to exercise his right to go to work? I think it can be, but I think in most cases it does, the board simply looks at how, what impact does that have on the non-striker, in terms of how would that person react to the situation? A reasonable, reasonable objective person. And in here, the board was reasonable in finding that a reasonably objective driver would find that when the person, when passing into a passing lane at high speeds is blocked, that that would reasonably tend to coerce or intimidate them in their going to work. And in fact, here, Mr. Conley did testify to being intimidated, and his actions subsequent do indicate that he was. He didn't testify that he felt intimidated. I thought he testified he felt harassed. He felt harassed was the word he used. He also used frustrated, and he also testified that he turned off the highway to get out of the conflict. And in our view, a conflict indicates intimidation. There's also ample evidence that Mr. Conley did hit the brakes. I know that was a question that was asked when he passed, both Mr. Diggs and Mr. Conley testified to that. In terms of overall what the board did with the ALJ's decision, the ALJ focused on a very narrow set of facts. And the reason the ALJ did that, and certainly in his conclusions, he recited some facts that we think were very relevant, but didn't ultimately make a determination on them. And the reason he didn't do that was because, as the D.C. Circuit found, he focused on violence, the narrow inquiry of violence. That clearly is not the test, and you can see in the ALJ's decision, his conclusion as to that being the relevant factor. So upon remand, the board had a larger record than what the ALJ had truly analyzed, and it appropriately looked at the facts, including the highway speed, including the traffic being backed up. Also note that Mr. Conley and Mr. Diggs had crossed over a very raucous picket line at the Rutledge facility that morning. They saw Ms. Weaver, the first driver, pass them, honk. As she pulled over, Ms. Hudson then passed them, engaged in hand motioning, according to both Mr. Conley and Mr. Diggs, and this is not discredited testimony, then the slowing occurred. So Mr. Conley reasonably, in our view, particularly given the evidence that three cars, that she slowed down and three cars were allowed to pass as he, prior to his trying to pass, reasonably viewed that as a targeted action against him. I see my time is up. I will, thank you very much. Thank you, counsel. Rebuttal, Mr. Grant. Thank you, Your Honor. I want to just focus a little bit on this point about the difference between annoying and frustrating conduct and conduct that intimidates, of course, is non-strikers. And I think it's very important here because what you're dealing with is the Section 7 rights of Ms. Hudson, right? She has the right to follow strikers, non-strikers in her car. The D.C. Circuit found that she was engaged in strike-related conduct when she moved in front of Mr. Conley. So for her to forfeit the protection of the act, it can't just be, you can't construe intent or infer intent merely from her following or moving in front of or targeting. She has the right to do that. Any striker has the right to follow a non-striker in a car. And so her 39-year record is very relevant. It goes to her credibility. The fact that in these two other incidents when she was accused of intentionally harassing non-strikers in her car, definitively rejected by the ALJ, the Ford, and the D.C. Circuit, finding that she did not intend to engage in any harassment of strikers, but in fact was driving carefully in order to be safe. So the third, the other point here is that the board seems to infer by the mere fact that this is highway speed driving, that this was dangerous. First of all, the board argued to the D.C. Circuit expressing not dangerous. They stated that in their brief. And second, highway speed driving is done at highway speeds. And Ms. Hudson followed the speed limit at the whole time, too. The case is taken under advisement with thanks to all counsel.